UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Diane Lynn Richardson

     v.

Andrew Saul, Commissioner,
U.S. Social Security Administration

Civil No. 20-cv-489-LM
Opinion No. 2021 DNH 134 P

# O R D E R

Pursuant to 42 U.S.C. § 405(g), Diane Lynn Richardson seeks judicial review of the decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits. Richardson moves to reverse the Commissioner's decision, contending that the Administrative Law Judge ("ALJ") improperly weighed medical opinions, improperly evaluated Richardson's subjective testimony, mischaracterized medical evidence, and used incorrect standards in evaluating medical evidence. On the basis of these alleged errors, Richardson argues that the ALJ erred both in finding that her impairments did not meet or equal one of the impairments listed in Part A of Appendix 1 to Part 404, Subpart P of Title 20 of the Code of Federal Regulations and in assessing her mental residual functional capacity. The Administration moves to affirm. For the reasons discussed below, the decision of the Commissioner is affirmed.

## STANDARD OF REVIEW

In reviewing the final decision of the Commissioner under Section 405(g), the court "is limited to determining whether the ALJ deployed the proper legal

standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); accord Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001). The court defers to the ALJ's factual findings as long as they are supported by substantial evidence. 42 U.S.C. § 405(g); see also Fischer v. Colvin, 831 F.3d 31, 34 (1st Cir. 2016). "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (citation omitted). Rather, the court "must uphold the Commissioner's findings if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support her conclusion." Id. (citation, internal modifications omitted).

## DISABILITY ANALYSIS FRAMEWORK

To establish disability for purposes of the Social Security Act (the "Act"), a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987). The claimant "has the burden of production and proof at the first four steps of the process." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). The

first three steps are: (1) determining whether the claimant is engaged in substantial gainful activity; (2) determining whether she has a severe impairment; and (3) determining whether the impairment meets or equals a listed impairment. 20 C.F.R. § 404.1520c(a)(4)(i)-(iii).

If the claimant meets her burden at the first two steps of the sequential analysis, but not at the third, an ALJ assesses the claimant's residual functional capacity ("RFC"), which is a determination of the most a person can do in a work setting despite the limitations caused by her impairments. Id. §§ 404.1520(e), 404.1545(a)(1); see also S.S.R. No. 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996). At the fourth step of the sequential analysis, the ALJ considers the claimant's RFC in light of her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can perform her past relevant work, the ALJ will find that the claimant is not disabled. See id. If the claimant cannot perform her past relevant work, the ALJ proceeds to the fifth step, at which it is the Administration's burden to show that jobs exist in the economy which the claimant can do in light of her RFC. See id. § 404.1520(a)(4)(v).

## PROCEDURAL HISTORY

Richardson filed an application for disability insurance benefits on June 29, 2017, alleging a disability onset date of December 19, 2015. Richardson alleged that she was disabled due to depression, anxiety, psoriatic arthritis, psoriasis, migraine headaches, insomnia, degenerative disc disease, and rosacea. Richardson met the insured status requirements of the Act through December 31, 2018.

After the Administration denied her application on November 29, 2017, Richardson requested a hearing before an ALJ.  The ALJ held the requested hearing on December 4, 2018.  Impartial psychological expert James Claiborn, Ph.D. and impartial medical expert Joseph Gaeta, M.D. both testified at the hearing before it was continued to March 28, 2019.[1]  At the March 28, 2019 continuation of the hearing, Richardson testified, as did her husband and impartial vocational expert Louis A. Laplante.

The ALJ issued an unfavorable decision on April 25, 2019.  He found that Richardson had a combination of severe impairments consisting of psoriatic arthritis, obesity, persistent depressive disorder, and general anxiety disorder.[2] The ALJ found that Richardson's combination of impairments did not meet or equal the severity of any of the impairments listed at 20 C.F.R. § 404, Subpart P, Appendix 1, including Listing 12.04 (depressive, bipolar, and related disorders), Listing 12.06 (anxiety and obsessive-compulsive disorders), and Listing 14.09 (inflammatory arthritis).

---

[1]  Impartial vocation expert Whitney Eng also appeared at the hearing but did not testify.

[2]  The ALJ found that Richardson was not severely impaired in connection with her migraine headaches or degenerative disc disease.  He did not, however, address her complaints of psoriasis or rosacea; Richardson does not assign error to that omission.  The court's review of Richardson's medical records does not indicate that Richardson's psoriasis or rosacea caused or contributed to medically determinable functional limitations in her ability to work during the relevant period that could be expected to last at least 12 continuous months.  Accordingly, the court does not find that the ALJ erred by failing to address Richardson's psoriasis or rosacea.  See 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1509.

The ALJ found that Richardson had the residual functional capacity to perform light work as defined at 20 C.F.R. § 404.1567(b), with the following limitations:

> [Richardson] is limited to frequent balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs, and no climbing ladders, ropes, or scaffolds.  She must never be exposed to unprotected heights.  She is limited to performing simple, routine tasks, with no interaction with the general public.  She is limited to no more than occasional changes in the work environment.

Admin. Rec. at 17.

In assessing Richardson's RFC, the ALJ found that Richardson's testimony regarding the intensity, persistence, and limiting effects of her symptoms was not fully consistent with the available medical evidence.  The ALJ considered all of the medical evidence of record, including the opinions of Dr. Claiborn, examining psychologist Maurice Regan, Psy.D., reviewing consultative psychologist Jan Jacobson, Ph.D., and treating nurse Steve Arvin, A.P.R.N.  In assessing Richardson's mental RFC, the ALJ found Dr. Claiborn's opinion "most persuasive," Dr. Regan's opinion "partially persuasive," and the opinions of Dr. Jacobson and Nurse Arvin "not persuasive."  Id. at 21-23.

In response to hypothetical questions posed by the ALJ, vocational expert Laplante testified to his opinion that a person with Richardson's age, education, past work experience, and RFC (as assessed by the ALJ) could perform the job duties of occupations existing in significant numbers in the national economy, offering as representative examples garment sorter, injection molding machine operator, and marker.  Id. at 63-64.  Laplante testified in response to further

hypothetical questions that a person with Richardson's age, education, past work experience, and RFC who had either the additional limitation that she would "miss two days or more per month on an ongoing and a chronic basis" or the additional limitation that she would "be off task up to 15% of the day," she would not be able to perform the job duties of any occupation existing in significant numbers in the national economy.  Id. at 64-65.  Based in part on Laplante's testimony that a person with Richardson's RFC could perform the job duties of specified occupations, the ALJ found at Step Five of the sequential process that Richardson was not disabled for purposes of the Social Security Act and had not been under a disability from December 19, 2015 (her alleged disability onset date) through December 31, 2018 (Richardson's date last insured).

On March 4, 2020, the Appeals Council denied Richardson's request for review.  In consequence, the ALJ's decision became the Administration's final order for purposes of judicial review.  20 C.F.R. § 422.210(a); see also, e.g., Sims v. Apfel, 530 U.S. 103, 107 (2000).  This action followed.

## DISCUSSION

Richardson argues that reversal is warranted because the ALJ improperly evaluated the relative persuasiveness of the medical opinions of Drs. Claiborn, Regan, and Jacobson and of Nurse Arvin, improperly evaluated her subjective testimony regarding her symptoms, mischaracterized and misconstrued substantial medical evidence of record, and applied an incorrect standard in evaluating whether her impairments met or equaled the requirements of Listing 12.04 (depressive,

bipolar, and related disorders).  On the basis of these errors, Richardson argues, the

ALJ further erred in concluding that Richardson's symptoms did not satisfy the

requirements of Listing 12.04 and in assessing her mental RFC (Richardson does

not assign error to the ALJ's assessment of her physical RFC).  It is Richardson's

position that, in consequence, the ALJ erred in concluding that she was not disabled

during the relevant period.  The court addresses these arguments below.

I.      Factual Background

A detailed recital of the factual background can be found in Richardson's

statement of facts (doc. no. 6-2) as supplemented by the Commissioner's statement

of facts (doc. no. 8) and in the transcript of the administrative record (doc. no. 5).

The court provides below a brief summary of the case, including details from

Richardson's medical history as needed to address the issues raised by the parties.

A.      Work History

During the period from 1996 to 2004, Richardson worked as a certified

nursing assistant at Concord Hospital.  From 2004 to 2007 and from 2009 to 2012,

she worked in the office of her husband's auto salvage yard.  In 2008 and 2009, the

period intervening between her two stints in the salvage yard, she worked as a

janitor for the Pittsfield School District.  After leaving the salvage yard in 2012, she

had a period of unemployment and then worked as a part-time fast-food worker at a

McDonald's restaurant for part of 2014 and most of 2015.  She also worked for

approximately two weeks as a trainee shelf-stocker at a Walmart in 2015.

Richardson testified that she left her job at Walmart voluntarily because she

"had a lot of anxiety, and . . . a lot of discomfort trying to bend over to put things on

shelves."  Admin. Rec. at 39.  She further testified that she left her job at

McDonald's because she "thought maybe if [she] got a job that [she] liked better,

that [she] would feel better and [she] would be able to work more hours and feel

better, and want to stay working and be able to work."  Id. at 40.  She testified that

she stopped working for the auto salvage yard because her husband was physically

incapable of operating it due to multiple sclerosis.  Id. at 44.

As noted, Richardson alleges a disability onset date of December 19, 2015.


B.    Material Medical History

Richardson saw Nurse Arvin approximately monthly or bimonthly from 1998

through at least February 2019, primarily for management of her depression and

anxiety medications (although the Administrative Record only contains records of

their relevant consultations from November 2014 through November 2018).  Admin.

Rec. at 407-17, 457, 462-63, 492, 497-500.  In November 2014, Richardson reported

to Nurse Arvin that she was "feeling depressed due to her ongoing stressors with

her daughters and since lowering the dosage of" one of her depression medications.

Id. at 416.  She further reported "lack of motivation, ambition, interest, [and] feeling

tired, difficulties staying [a]sleep."  Id.  Nurse Arvin assessed her level of depression

as moderate to severe.  Id.  However, she was "reportedly doing better" by December 2014.  Id.  She reported "[d]oing OK" in March 2015.  Id. at 415.

Richardson complained to Nurse Arvin regarding lack of motivation and initiation in June 2015, ongoing stress over her daughter in July 2015, and depression, lack of interest, and lack of motivation in September 2015.  Id.  Nurse Arvin recommended counseling in June and September 2015 and adjusted Richardson's medications in September 2015.  Id.  In October 2015 Richardson reported that she was "[d]oing better" on the adjusted regime.  Id.  She nevertheless reported increased "worrying, anxiety and occasional episodes of near panic attacks" in November 2015, in response to which Nurse Arvin adjusted her medications and recommended counseling.  Id. at 414.  Richardson reported "[d]oing better" on the adjusted medications and experiencing less worry and anxiety in December 2015. Id.  Nurse Arvin reiterated his recommendation that she pursue counseling.  Id.

Richardson alleges onset of disability as of December 19, 2015.

In February 2016, Richardson reported to Nurse Arvin that she was doing "OK," but also complained of "ongoing lack of motivation[ and] interest, social isolation, ongoing physical inactivity and none to minimum participation in chores," as well as stressors related to her family situation.  Id. at 412.  She presented as friendly and engaged, with organized speech and no overt anxiety, but also as "overtly depressed."  Id.  Nurse Arvin again recommended counseling, to which Richardson expressed herself "adamantly" opposed.  Id.  Richardson told Nurse

Arvin, "I am OK.  I am dealing with my issues alright.  I can talk to my family if I need to."  Id.

In March 2016, Richardson reported mild improvement, stating that she felt "somewhat more motivated," less anxious, better able to take care of her grandchildren, and crying less frequently.  Id. at 411.  She nevertheless reported a worsening of her depression symptoms in April 2016, in response to which Nurse Arvin adjusted her medications and recommended counseling.  Id. at 410.  On that occasion, Richardson agreed to call a counselor.  Id. at 409.  At a May 2016 follow-up appointment, however, it became clear that she had not called a counselor, and she "demonstrated and expressed no willingness to implement any non-pharm[aceutical] suggestions."  Id. at 408.

Richardson reported that she was "[d]oing better" in September 2016.  Id. at 417.  Nurse Arvin reiterated his recommendation that she seek counseling at appointments in September and November 2016.  Id.  Richardson reported "[s]ome improvements" and that she was "[d]oing moderately better" in December 2016 but continued to complain of depression and obsessive worrying about her children.  Id.  Nurse Arvin once again recommended that she seek counseling.  Id.

In February and April 2017, Richardson reported to Nurse Arvin that she was "[d]oing OK."  Id. at 407.  In June and July 2017 she reported ongoing sadness and worry over her children.  Id.  Nurse Arvin recommended counseling on both occasions.  Id.

On September 15, 2017, Nurse Arvin filled out a "Mental Impairment Questionnaire" on Richardson's behalf in support of her June 29, 2017 application for DIB. <u>Id.</u> at 418-19. He opined that Richardson suffered from major depression and generalized anxiety and experienced difficulties with her attention span. <u>Id.</u> at 418. He further opined that she was "impaired" in her abilities to understand, remember, and apply information, to concentrate, persist, or maintain pace, and to adapt and manage herself, and "moderately — severely impaired" in her ability to interact with others. <u>Id.</u> at 419.

On November 13, 2017, agency examining psychologist Dr. Regan conducted a comprehensive psychological profile of Richardson. <u>Id.</u> at 428-34. Dr. Regan opined that Richardson was cooperative with the examination and interview, spoke entirely normally, and presented with a subdued and pessimistic mood and an affect that ranged from normal to flat. <u>Id.</u> at 429. He opined that her thought content was entirely normal, with no evidence of hallucination, delusions, misinterpretations, preoccupations, obsessions (aside from worries about her family), phobias, or plans for homicide or suicide. <u>Id.</u> He found that she was fully oriented to time, place, and the purpose of the interview. <u>Id.</u> He assessed her IQ as within the normal range and both her short- and long-term memory as unimpaired. <u>Id.</u> He noted that she completed all tasks of the Mini-Mental State Examination with the maximum possible score of 30 (on the Mini-Mental State Examination, a score above 24 indicates the absence of cognitive impairment and a score below 18 indicates severe cognitive impairment). <u>Id.</u>

Dr. Regan recorded Richardson's report that she awakens between 9:30 and 10:30 each day, and then spends all day watching television in her pajamas.  Id. at 430.  He further noted her report that she sleeps poorly at night even with the aid of a sleeping pill.  Id.

Dr. Regan noted Richardson's 12-year history of employment as a certified nursing assistant.  Id. at 431.  He then stated as follows:

> She has learned and executed the tasks of [a certified nursing assistant] and a retail sales worker.  She reported no difficulties on the job aside from a certain distaste for certain job tasks or a chronic medical condition that caused her termination.  I believe she has the ability to understand, remember, and apply information related to the performance of work activities.

Id.  He did not find that she had any significant impairments in her ability to interact with supervisors, co-workers, or the public.  Id.  He opined that while she might require a "period of adjustment or 'work hardening'" before she would be able to sustain full-time employment, following such a period she would not be significantly impaired in her ability to concentrate, persist, and maintain pace.  Id. at 432.  He opined that she had no impairments in adapting or managing herself. Id.  He diagnosed Richardson with persistent depressive disorder and opined that if she were willing to revise her treatment regime, it was likely that her mood would improve and that she would be able to return to work.  Id. at 432-33.  He recommended behavior treatments, regular physical exercise, and vocational counseling.  Id. at 433.

Agency consultative psychologist Dr. Jacobson reviewed Richardson's then-available medical records on November 26, 2017.  Id. at 108-17.  Based on that

review, she opined that Richardson's impairments did not meet or equal Listing 12.04 (depression, bipolar, and related disorders) or Listing 12.06 (anxiety and obsessive-compulsive disorders).  Id. at 114.  Dr. Jacobson noted that Richardson had a history of "strictly outpatient psychiatric treatment," and that the focus of her office visits with Nurse Arvin was "difficulties with daughter and husband's chronic illness."  Id.  Dr. Jacobson opined that Richardson's "depressed affect" was "secondary to these issues."  Id.  Dr. Jacobson specifically found that Nurse Arvin's opinion regarding Richardson's mental impairments was entitled to "little weight" because neither his own mental status findings and progress notes nor Dr. Regan's findings supported "a severe mental impairment."  Id.

Dr. Jacobson opined on the basis of Richardson's reported activities of daily living that she "follows instructions very well, gets along with authority, [and] never had difficulties getting along."  Id.  Dr. Jacobson additionally noted Richardson's score of 30 on the Mini-Mental State Examination.  Id.  On the basis of Richardson's activities of daily living and MMSE score of 30, Dr. Jacobson opined that Dr. Regan's opinion was entitled to "great weight."  Id.  She further opined that Richardson's subjective statements regarding her limitations in basic work activity were "credible at a mild level of restriction."  Id.  She concluded that Richardson's mental impairments, considered in combination, "do not significantly impact [her] ability to perform basic work-related activities and are thus considered non-severe." Id.

As noted, the Administration initially denied Richardson's DIB application on November 29, 2017.  In February and March 2018, Richardson reported to Nurse Arvin that she was "[d]oing OK" but continued to complain of ongoing stress in connection with her family situation.  Id. at 457.  On both occasions, Nurse Arvin urged her to pursue counseling and to discontinue her social isolation.  Id.  On both occasions Richardson refused.  Id.

On May 2, 2018, Nurse Arvin filled out a "Mental Impairment Questionnaire" provided to him by Richardson's attorney.  Id. at 458-61.  Through entries on the form, Nurse Arvin opined that Richardson had a "marked" limitation in her general ability to do work-related activities on a sustained basis, id. at 458, but only "moderate" limitations in all of the specific work-related functions listed under that rubric, namely her abilities to understand, remember, and apply information, to interact with others, to concentrate, persist, and maintain pace, and to adapt and manage herself, id. at 459.  He opined that Richardson had these moderate limitations due to her anxiety in social and interpersonal situations.  Id. at 459.  He opined that Richardson's limitations were likely to persist over the long term.  Id. at 460.  In addition, Nurse Arvin opined that Richardson could be expected to be off-task for 15% or more of a given workday due to difficulties in concentration, persistence, and maintaining pace.  Id. at 461.  Finally, he checked a box indicating his opinion that Richardson had "minimal capacity to adapt to changes in . . . her environment or to demands that are not already part of . . . her daily life.  Id.

In June 2018, Richardson reported to Nurse Arvin that she was "doing OK," but still worried about ongoing family matters and still socially isolated. Id. at 463. Nurse Arvin again recommended counseling. Id.

On July 6, 2018, Richardson's counsel asked Nurse Arvin to clarify some of the responses he provided through the form he filled out on May 2, 2018. Id. at 465-66. In particular, counsel asked Nurse Arvin to describe the severity of Richardson's depression during the years when she had been employed relative to the present, to explain the discrepancy between his opinion that Richardson had "marked" limitations in her ability to perform work-related activities on a sustained basis and his opinion that she had only "moderate" limitations in her specific work-related functions, and to offer his opinion as to why Richardson consistently refused to pursue counseling despite Nurse Arvin's frequently repeated recommendation that she do so. Id.

Nurse Arvin responded by letter on July 11, 2018. Id. at 473. In his letter, Nurse Arvin opined that Richardson's "depression and anxiety were always significantly worse while she was employed" and that her "overall mental state is much less severe when not working." Id. He also opined that Richardson refused counseling both because her condition caused her to avoid contact with others—in particular contact that might result in a negative evaluation—and because her depression caused her to believe that counseling would be ineffective. Id. Finally, he opined that while Richardson was only moderately impaired in the work-related

functions listed on the form he completed on May 2, 2018, she was "markedly impaired" in her ability to perform "basic chores around the house." Id.

Richardson reported to Nurse Arvin that she was "[d]oing OK" in August 2018 and "[d]oing fairly OK" in November 2018.  Id. at 492, 498.

As noted, the first hearing before the ALJ took place on December 4, 2018. Reviewing consultative psychologist Dr. Claiborn testified at that hearing.  Dr. Claiborn opined on the basis of his review of Richardson's medical records that Richardson suffered from persistent depressive disorder and generalized anxiety disorder.  Id. at 88-89.  He specifically opined that she was mildly restricted in her abilities to understand, remember, and apply information and to adapt and manage herself, and moderately restricted in her abilities to interact with others and to concentrate, persist, and maintain pace.  Id. at 89.  Dr. Claiborn opined that, because of the restrictions, Richardson would need to have "very limited or no contact with the general public," and that "she would probably be most functional with relatively simple, limited-step kind of tasks, and with occasional changes in the workplace or work environment and demands."  Id.

When asked about the difference between his opinion and that of Nurse Arvin regarding whether Richardson was mildly or moderately limited in her abilities to understand, remember, and apply information and to adapt and manage herself, Dr. Claiborn stated that he did not "completely agree" with Nurse Arvin's conclusions, and that his evaluation of the clinical findings of record differed from Nurse Arvin's.  Id. at 90-96.  By contrast, Dr. Claiborn opined that Dr. Regan's

report was "credible" and consistent with the restrictions he found support for in Nurse Arvin's progress notes.  Id. at 97-98.  Dr. Claiborn conceded that he had not reviewed any of Richardson's subjective self-reports regarding her symptoms and impairments.  Id. at 102-103.

As noted, Richardson's date last insured was December 31, 2018.[3]

II.   The ALJ's Evaluation of the Medical Opinions

Richardson argues that the ALJ erred in evaluating the persuasiveness of the medical opinions of record.  Specifically, Richardson argues that the ALJ omitted to discuss the "supportability" of the opinions offered by Drs. Claiborn, Regan, and Jacobson and by Nurse Arvin.  The court agrees with Richardson that the ALJ was under an affirmative obligation to discuss the "supportability" of each of those providers' opinions:

> For applications like this one, filed on or after March 27, 2017, the [Administration] has fundamentally changed how adjudicators assess opinion evidence.  The familiar and longstanding requirements—that adjudicators must assign "controlling weight" to a well-supported treating source's medical opinion that is consistent with other evidence, and, if controlling weight is not given, must state the specific weight that is assigned—are gone.

Nicole C. v. Saul, Case No. CV 19-127JJM, 2020 WL 57727, at *4 (D.R.I. Jan. 6, 2020) (citing 20 C.F.R. § 404.1520c(a)).  Under the regulations governing Richardson's application, an ALJ does not assign specific evidentiary weight to any

_____

[3] Although Nurse Arvin recorded two progress notes after Richardson's date last insured that are in the Administrative Record, neither constitutes evidence material to Richardson's application.

medical opinion and need not defer to the opinion of any medical source (including the claimant's treating providers).  20 C.F.R. § 404.1520c(a).  Instead, the ALJ evaluates the relative persuasiveness of medical opinions in terms of five specified factors.  Id.

The five factors the ALJ considers in evaluating the persuasiveness of a medical opinion are supportability (the relevance of the objective medical evidence cited by the medical professional in support of the professional's opinion), consistency (how consistent the opinion is with all of the evidence from medical and non-medical sources), treatment/examining relationship (including length of treatment relationship, frequency of examinations, purpose of treatment relationship, and existence and extent of treatment/examining relationship), specialization (the relevance of the medical professional's specialized education or training to the claimant's condition), and what the Administration refers to as "other factors" (the medical professional's familiarity with the claimant's medical record as a whole and/or with the Administration's policies or evidentiary requirements).  Id. § 404.1520c(c)(1)-(5) (emphasis supplied).  Of the five factors, the "most important" are supportability and consistency.  Id. §§ 404.1520c(a), 404.1520c(b)(2).

Although the ALJ must consider all five of the factors in evaluating the persuasiveness of medical evidence, the ALJ is, in most cases, only required to discuss application of the supportability and consistency factors in the written decision.  Id. § 404.1520c(b)(2).  Only where contrary medical opinions are equally

persuasive in terms of both supportability and consistency is the ALJ required to discuss their relative persuasiveness in terms of the treatment or, examining relationship, specialization, and other factors.  Id. § 404.1520c(b)(3).  In addition, where a single medical professional offers multiple opinions, the ALJ is not required to discuss each opinion individually, but instead may address all of the professional's opinions "together in a single analysis."  Id. § 404.1520c(b)(1).

Moreover, while the ALJ must consider all the relevant evidence in the record, id. § 404.1520b(a)-(b), the ALJ need not discuss evidence from nonmedical sources, including evidence from the claimant, the claimant's friends and family, educational personnel, and social welfare agency personnel.  Id. §§ 404.1502(e), 404.1520c(d).  And while the regulations require the ALJ to discuss the relative persuasiveness of all medical source evidence, id. § 404.1520c(b), the claimant's impairments must be established specifically by evidence from an acceptable medical source, id. § 404.1521.  "Acceptable medical sources" are limited to physicians and psychologists, and (within their areas of specialization or practice) to optometrists, podiatrists, audiologists, advanced practice registered nurses, physician assistants, and speech pathologists.  Id. § 404.1502(a).  Evidence from other medical sources, such as licensed social workers or chiropractors, is insufficient to establish the existence or severity of a claimant's impairments.  Id.

Finally, the ALJ is only required to discuss evidence that is "inherently . . . valuable [or] persuasive," including decisions by other governmental agencies or nongovernmental entities, findings made by state disability examiners at any

previous level of adjudication, and statements by medical sources as to any issue

reserved to the Commissioner.  Id. § 404.1520b(c).

It is Richardson's position that the ALJ either collapsed the supportability

and the consistency factors into a single inquiry or omitted to discuss supportability

at all in evaluating the persuasiveness of each of the four medical opinions at issue.

A.      Opinion of James Claiborn, Ph.D.

Reviewing psychologist Dr. Claiborn offered his opinion of Richardson's

functional limitations at the hearing of December 4, 2018.  Admin. Rec. at 88-89.

Dr. Claiborn's opinion was based solely on his review of Richardson's medical

records.  Id.  Regarding the supportability of Dr. Claiborne's opinion, the ALJ noted

that "Dr. Claiborn found that [Richardson]'s records reflect that she has a persistent

depressive order and general anxiety disorder."  Id. at 21.  He further observed that

although Dr. Claiborn acknowledged Nurse Arvin's opinion that Richardson had a

marked limitation in her ability to maintain work activities, Dr. Claiborn did not

find support for that limitation "in the records."  Id. at 21-22.  The ALJ noted that

Dr. Claiborn relied on and found persuasive Dr. Regan's findings in connection with

his examination of November 13, 2017, id. at 22, and observed that Dr. Claiborn

had "had the opportunity to review all of the medical records submitted through the

date of the hearing."  Id.; see also id. at 21, 23.  Finally, the ALJ expressly observed

that Dr. Claiborn "provided citations to the records to support his opinion."  Id. at

22.

Although the ALJ's discussion of the supportability of Dr. Claiborn's opinion was by no means extensive, it does not constitute, as Richardson argues, a complete omission. To the contrary, the ALJ's discussion addressed the evidence Dr. Claiborn recruited in support of his opinion, explained the reasons the ALJ found Dr. Claiborn's opinion persuasive, and was generally supported by citations to substantial evidence of record. The court accordingly finds no error in the ALJ's concededly minimal discussion of the supportability of Dr. Claiborn's opinion.

B.   Opinion of Maurice Regan, Psy.D.

Consultative examining psychologist Dr. Regan offered opinions regarding Richardson's functional limitations based on his examination of Richardson, on her self-reports regarding her job history and daily activities, and on Nurse Arvin's treatment notes. Id. at 428-33. In discussing the supportability of Dr. Regan's opinion, the ALJ appears at least in part to have collapsed and conflated the supportability and consistency factors, noting for example that Dr. Regan's opinion was "partially supported by [Richardson]'s minimal treatment records during the relevant time period" (thus using the terminology of supportability to discuss the consistency of Dr. Regan's opinion with the medical evidence). Id. at 22. However, the ALJ also correctly noted that Dr. Regan's opinion was supported by internal reference to Richardson's relevant reported daily activities, id., and discussed at length the November 13, 2017 examination that primarily underlay Dr. Regan's opinion, id. at 20, 21, 22. Again, although the ALJ's discussion of the supportability

of Dr. Regan's opinion was minimal, it is sufficient to satisfy the requirements of 20 C.F.R. § 404.1520c(b)(2). See, e.g., Christopher J. G. v. Saul, No. 2:19-cv-00562-GZS 2020 WL 6938811, at *3 (D. Me. Nov. 25, 2020) (finding sufficient an ALJ's minimal references to supportability interspersed throughout the ALJ's opinion) (report and recommendation adopted, No. 2:19-CV-00562-GZS, 2020 WL 7265846 (D. Me. Dec. 10, 2020)).

C.      Opinion of Jan Jacobson, Ph.D.

Reviewing consultative psychologist Dr. Jacobson opined as to Richardson's functional limitations based on her review of Richardson's medical records as of November 26, 2017.  Admin. Rec. at 108-117.  The ALJ did not reference the supportability of Dr. Jacobson's opinion in evaluating its persuasiveness.  Id. at 22-23.  However, this omission, while erroneous, was necessarily harmless under the circumstances.  See Shinseki v. Sanders, 556 U.S. 396, 409-411 (2009).[4]  This is because the ALJ found Dr. Jacobson's opinion "not persuasive" on the ground that it was inconsistent with the medical evidence of record.  Admin. Rec. at 21-22.  Moreover, Dr. Jacobson's opinions that the ALJ expressly found unpersuasive were that Richardson "had no severe psychological impairment" and that Richardson did not have "significant limitations" in her social functioning or ability to complete

_____

[4]    Where correction of an ALJ's error could not change the outcome of a case, the error cannot have prejudiced the claimant and remand is not mandated.  See, e.g., Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000); Van Ngo v. Saul, 411 F. Supp. 3d 134, 145 (D. Mass. 2019).

tasks.  Id.; see also id. at 114.  Thus, if the ALJ had fully credited Dr. Jacobson's opinion, he would have included fewer and less severe limitations in his assessment of Richardson's mental RFC and would not have found her disabled.  The ALJ's omission to discuss the supportability of Dr. Jacobson's opinion therefore does not constitute grounds for disturbing the Commissioner's decision.  See Ward, 211 F.3d at 656; see also e.g., Halla v. Colvin, No. 15-cv-30021, 2016 WL 234802, at *7 (D. Mass. Jan. 20, 2016).

       D.     Opinion of Steve Arvin, A.P.R.N.

Nurse Arvin provided opinion regarding Richardson's functional limitations based on his own decades-long treating relationship with her.  Admin. Rec. at 418-419, 458-461, 473.  The ALJ found Nurse Arvin's opinions to be unpersuasive primarily because the opinions were inconsistent with the medical evidence as a whole.  Id. at 23.  However, the ALJ additionally found that Nurse Arvin's opinions were not well supported by Nurse Arvin's own treatment notes.  Id.  Particularly in light of the fact that the ALJ found Nurse Arvin's opinions to be unpersuasive on consistency grounds, which alone would have constituted sufficient grounds for finding Nurse Arvin's opinion less persuasive than Drs. Claiborn's or Regan's, his minimal discussion of supportability is sufficient to satisfy the requirements of 20 C.F.R. § 404.1520c(b)(2).  See, e.g., Christopher J. G., 2020 WL 6938811, at *3.

III.    The ALJ's Evaluation of Richardson's Subjective Testimony

Richardson next argues that the ALJ erred in evaluating her subjective testimony regarding the intensity, persistence, and limiting effects of her symptoms; she does not, however, identify specific testimony that the ALJ inappropriately failed to credit.  The court notes that at the hearing of March 28, 2019, Richardson testified that the psychological symptoms that prevented her from working were "very bad anxiety and depression."  Admin. Rec. at 45.  She testified that these symptoms prevented her from working because she felt that she was "always upset."  Id. at 49.  She further testified to a lack of motivation that made her not want to do things she might otherwise be capable of doing, id., and to being "always exhausted and tired," id. at 54.   She testified to not doing any chores around the house and to spending her days watching television.  Id. at 49-50.  She cried while offering this testimony.  Id. at 49-51.  The ALJ opined that Richardson's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms" of depression and anxiety, but that Richardson's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  Id. at 19.

Richardson's primary argument that the ALJ erred in his evaluation of her testimony is that he tacitly applied a higher standard than appropriate when he stated that her statements were "not entirely consistent" with the medical evidence. As Richardson correctly notes, the ALJ is required to determine only whether her

testimony "can reasonably be accepted as consistent" with the medical evidence. See 20 C.F.R. § 404.1529(a).  However, the ALJ's use of the phrase "not entirely consistent" cannot fairly be read to suggest that the ALJ imported and applied an improperly high standard in evaluating Richardson's subjective testimony, particularly in light of his subsequent detailed discussion of Richardson's testimony and of its inconsistency with the medical evidence of record.  Id. at 19-20. Numerous courts have considered and rejected the argument that an ALJ's use of a phrase like "not entirely consistent" is evidence that the ALJ applied an incorrect standard, in particular where, as here, the ALJ's deployment of the phrase is followed by a discussion that is consistent with the appropriate standard.  See, e.g., Melanie S. v. Saul, No. 18-cv-00369, 2019 WL 4024097, at *10 (D.R.I. Aug. 27, 2019); Seibel v. Saul, No. 19-cv-643, 2020 WL 1812448, at *7 (E.D. Wis. Apr. 8, 2020).

In the alternative, Richardson argues that the ALJ's discussion failed to establish that her subjective testimony was not reasonably consistent with the medical evidence.  Again, the court disagrees.  The ALJ discussed Richardson's testimony in detail, id. at 18, and then contrasted her subjective reports with the medical records of evidence, which consistently establish the absence of severe psychological symptoms such as hallucinations, delusions, or suicidal or homicidal ideation, the absence of symptoms so severe as to require hospitalization or interventions more significant than out-patient office visits, normal mental status exams, consistently adequate grooming, and the absence of severe cognitive

impairment, id. at 19-20.  This is sufficient to satisfy the ALJ's obligation to
consider Richardson's subjective testimony.  See Coskery v. Berryhill, 892 F.3d 1, 4
(1st Cir. 2018); see also 20 C.F.R. § 404.1529(c)(3); S.S.R. 16-3p.  The ALJ's findings
regarding the credibility of Richardson's subjective testimony therefore provide no
grounds for disturbing the Commissioner's final decision.


IV.    Substantial Evidence Supports the ALJ's Findings

Richardson next argues that the ALJ's findings are not based on substantial
evidence because the ALJ misread and mischaracterized some of the medical
evidence.  For the following reasons, the court disagrees.

First, Richardson argues, the ALJ failed to base his findings on substantial
evidence because he construed Dr. Regan's opinion regarding Richardson's
limitations as applicable to the material time—that is, to the period between her
alleged disability onset date and her date last insured—notwithstanding that Dr.
Regan supported his opinion in part on Richardson's past work experience, which
preceded her disability onset date.  As a preliminary matter, however, it is far from
clear that the ALJ mischaracterized Dr. Regan's opinion.  Dr. Regan's opinion
regarding the relative absence of functional limitations was based in part on
Richardson's self-reported work history but also in part on her reports regarding the
challenges she had experienced in the workplace, her reports regarding her
activities of daily living, and, above all, Dr. Regan's November 13, 2017
comprehensive psychological profile.  Admin. Rec. at 431-433.  Moreover, Dr.

Regan's opinion regarding Richardson's functional limitations was expressed in the present tense, notwithstanding his use of the past tense to describe some of his supporting reasons, including his reliance on Richardson's work history.  Id.  The court finds reasonable the ALJ's conclusion that Dr. Regan's proffered opinion was intended to be contemporaneously applicable.

More critically, even if the ALJ incorrectly construed Dr. Regan's opinion, the ALJ's findings are not erroneous so long as they are supported by substantial evidence of record.  See 42 U.S.C. § 405(g); see also Fischer, 831 F.3d at 34; Slimane v. Astrue, No. CIV.A. 11-10058-RWZ, 2012 WL 1836371, at *7 (D. Mass. May 17, 2012).  As the ALJ noted, Dr. Regan's opinions find support in substantial evidence, including Richardson's self reports, her performance on the Mini-Mental State Examination, and other medical opinion evidence of record, including that of Dr. Claiborn.  Because the ALJ's findings regarding Dr. Regan's opinion are supported by substantial evidence, those findings provide no grounds for disturbing the Commissioner's decision.

Second, Richardson argues that the ALJ erred in characterizing the form her counsel provided to Nurse Arvin for the purpose of expressing his opinion of May 2, 2018 as a "check-off form."  Although the court agrees with Richardson that in addition to spaces for check marks and the like, the form contained blanks to be filled in, the court finds that Richardson has not met her burden to show that the ALJ's characterization of the form as a "check-off form" was prejudicial to her in any way.  See Shinseki, 556 U.S. at 409.

Third, Richardson argues that the ALJ erred in characterizing the mental health treatment Richardson received as "minimal," arguing that there is no evidence that the intervals between Richardson's consultations with Nurse Arvin were inappropriate. However, the court's review of the ALJ's opinion establishes that the ALJ did not base his findings regarding Nurse Arvin's opinions on the relative infrequency of their consultations but rather—and only in part—on the fact that her mental health challenges had never required her to be hospitalized or to receive treatment in addition to out-patient office visits and prescription medications. Admin. Rec. at 17-24. Accordingly, the court finds no error in the ALJ's characterization of Richardson's mental health treatment as "minimal."

Fourth, Richardson argues that even if the ALJ was justified in characterizing her mental health treatment as minimal, the ALJ erred in failing to discuss the possible reasons why Richardson never pursued counseling. However, again, the court's review of the ALJ's opinion establishes that the ALJ did not base his assessment of Richardson's mental RFC in significant degree on her failure to seek counseling. Moreover, the fact that there may have been clinical reasons for Richardson's refusal to seek counseling does not establish that she had any greater limitations in her work-related functions than those found by the ALJ. And finally, the ALJ's findings regarding Richardson's limitations find support in substantial evidence of record, including Nurse Arvin's treatment notes and Dr. Regan's examination of November 13, 2017.

Fifth, Richardson argues that the ALJ erred in basing his findings in part on Nurse Arvin's frequently repeated statement in his progress notes that Richardson was "[d]oing OK" on her medications.  As Richardson observes (and as discussed above), such reports were often accompanied by complaints of ongoing or worsening depression and anxiety.  The court readily agrees with Richardson that such statements have little to no tendency to support the finding that Richardson was not disabled at the time the reports were offered.  However, the court's review of the ALJ's opinion does not suggest that the ALJ placed undue reliance on these statements or otherwise based his decision on the statements to the exclusion of other substantial evidence of record.  To the contrary, the ALJ considered all of the available evidence, including the opinion of Dr. Claiborn, Richardson's performance on the Mini-Mental State Examination, Dr. Regan's examination, and Richardson's own self-reports.  The court finds no error on the ALJ's partial reliance on Nurse Arvin's progress notes suggesting occasional relative improvements in Richardson's mood or symptoms.

V.    The Record Does Not Establish that the ALJ Deployed Inappropriate Legal Standards

Richardson next argues that the ALJ applied the incorrect legal standard in considering whether her impairments met or equaled any of the impairments listed in Part A of Appendix 1 to Part 404, Subpart P of Title 20 of the Code of Federal Regulations.  Specifically, Richardson argues that the ALJ failed to consider the specific settings in which she was functioning when the medical findings of record

29

were made and failed to analyze the question whether her ability to function in those settings could be expected to translate to the workplace.

The court agrees that when evaluating the severity of a claimant's mental impairments, the applicable regulations require the ALJ to consider, among numerous other factors, "the settings in which [the claimant is] able to function." 20 C.F.R. § 404.1520a(c)(2).   However, notably, the regulations do not require the ALJ to discuss all of the factors considered in preparing the written decision. Instead, the written decision "must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." Id. at § 404.1520a(e)(4).

Here, the ALJ's written decision does not contain express discussion of whether Richardson's residual functional capacity as established by the medical evidence would apply in the workplace.  However, the decision contains no suggestion that the ALJ failed to consider the settings in which Richardson was able to function.  To the contrary, the decision establishes that the ALJ was aware that Richardson had been out of the workforce since late 2015 and was aware that the medical evidence of record pertained specifically to Richardson's functioning in a home setting.  Admin. Rec. at 17-23.  At the hearing of December 4, 2018 Richardson's counsel asked questions and elicited testimony from Dr. Claiborn specifically as to Richardson's functioning within the home setting.  Id. at 96. Moreover, the ALJ's assessment of Richardson's mental RFC included limitations

pertaining specifically to the workplace setting, namely that she was limited to performing simple, routine tasks, with no interaction with the general public, and to "no more than occasional changes in the work environment." Id. at 17.

Finally, the ALJ expressly considered at the third step of the five-step process whether Richardson's limitations caused any "inability to function independently outside [her] home." Id. Because the ALJ was under no obligation to include express discussion of functional settings in his written decision, the court accordingly finds no error in the legal standard the ALJ deployed in assessing the severity of Richardson's mental impairments.

## VI. The ALJ Did Not Err in Finding that Richardson's Impairments Did Not Meet or Equal Listing 12.04

A DIB claimant is considered disabled for purposes of the Act if her impairments meet or equal the criteria of the conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. "[I]t is the claimant's burden to show that [s]he has an impairment or impairments which meets or equal" a one of the listed conditions (each, a "Listing"). Torres v. Sec'y of Health & Human Servs., 870 F.2d 742, 745 (1st Cir. 1989). In order to sustain that burden, the claimant "must present medical findings equal in severity to all the [required] criteria" for the Listing at issue. Sullivan v. Zebley, 493 U.S. 521, 531 (1990) (emphasis in original) (superseded by statute on other grounds).

Listing 12.04 addresses depressive, bipolar, and related disorders. There are three discrete sets of criteria for determining whether a claimant meets or equals

Listing 12.04; a claimant must meet the "A" criteria and either the "B" or the "C" criteria to meet her burden at the third step of the five-step sequential process.  See 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.04.  Here, the ALJ considered the criteria set forth at Listing 12.04B and 12.04C and appears to have assumed arguendo that the criteria of Listing 12.04A were satisfied.  Richardson argues that her impairments meet or equal the criteria of Listing 12.04C.

To establish disability under Listing 12.04C, a claimant must show that her mental disorder is "serious and persistent," that it has been medically documented "over a period of at least two years," and that there is medical evidence of both:

1.  Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder . . . ; and

2.  Marginal adjustment, that is, [the claimant] ha[s] minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life . . . .

20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.04C.

Here, the ALJ found that the medical evidence did not support the conclusion that Richardson suffered from such marginal adjustment that she had minimal capacity to adapt to changes in her environment or to demands not already part of her daily life.  Admin. Rec. at 17.  Richardson argues that this was erroneous both because the ALJ should have credited Nurse Arvin's contrary opinion and because the ALJ should have discussed whether Richardson suffered from different functional limitations in the workplace than in the home.  For the reasons discussed

above, the court has already rejected both of these arguments, finding that the ALJ appropriately evaluated the persuasiveness of Nurse Arvin's opinion on the basis of substantial evidence and that the ALJ did not apply an incorrect legal standard at the third step of the five-step process.  Accordingly, the court finds no error in the ALJ's determination regarding the Listing 12.04C criteria.


VII.   <u>The ALJ Did Not Err in Assessing Richardson's Mental RFC</u>

Richardson's final argument is that the ALJ erred in assessing Richardson's mental RFC.  Specifically, Richardson argues that the ALJ erroneously failed to include in his assessment the limitations that Richardson would likely be absent from work at least two days of every month and would likely be off task for 15% or more of the workday.  Richardson argues that these limitations should have been included because the ALJ should have been persuaded by Nurse Arvin's opinion regarding her functional limitations.  However, for the reasons discussed above, the court has found that the ALJ appropriately evaluated the persuasiveness of Nurse Arvin's opinion on the basis of substantial evidence.  It follows that the ALJ did not err in failing to include these limitations in his assessment of Richardson's mental RFC.  For that reason, the ALJ likewise did not err in finding that Richardson was not disabled during the relevant period.

## CONCLUSION

For the foregoing reasons, Richardson's motion to reverse (doc. no. 6) is denied and the Commissioner's motion to affirm (doc. no. 7) is granted.  The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

August 26, 2021

cc:  Counsel of Record